# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-1420V

| | |
|---|---|
| EDEN WILLIAMS,<br><br>    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>    Respondent. | Chief Special Master Corcoran<br><br>Filed: January 30, 2024 |

*Bridget Candace McCullough*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Ronalda Elnetta Kosh*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On September 16, 2019, Eden Williams filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccination she received on October 12, 2017. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although Respondent conceded entitlement, the parties were not able to settle damages.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$80,000.00, for actual/past pain and suffering.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I.  **Relevant Procedural History**

On March 19, 2021 (approximately 18 months after initiation), Respondent filed a Rule 4(c) Report conceding entitlement. ECF No. 32. A Ruling on Entitlement was issued the same day. ECF No. 33. After attempting to resolve the issue of compensation for more than a year, the parties informed me in June 2022 that they had reached an impasse. ECF No. 53. On August 31, 2022, Petitioner filed a Supplemental Brief in Support of Damages ("Br."). ECF No. 56. Respondent filed a responsive memorandum ("Resp.") on November 4, 2022. ECF No. 59. The issue of damages is now ripe for resolution.

Petitioner requests an award of $135,000.00 for past pain and suffering, in compensation for Petitioner's "moderately severe SIRVA that ultimately required surgical intervention," with a course of approximately 30 months. Br. at 10-11. In addition, Petitioner requests reimbursement for out-of-pocket expenses of $2,091.18 and for past lost wages of $9,888.00. *Id.* at 13.

Respondent, by contrast, argues that an award of $62,500.00 in pain and suffering is appropriate because "Petitioner's vaccine-related injury was mild, limited, and the condition of her left shoulder was significantly affected by intervening events and comorbidities." Resp. at 14. Respondent also opposes any award for past out-of-pocket expenses or past lost wages. *Id.* at 20.

II.  **Relevant Facts**

A. *Petitioner's Medical History*

On October 12, 2017, Petitioner received the flu vaccine in her left shoulder at her employer, Beaumont Health, in Michigan. Ex. 1 at 1. Prior to her vaccination, Petitioner was being treated for migraines and neck pain, but had no pre-existing issues with her left shoulder. *See* Ex. 2 at 5; Ex. 11 at ¶4-7.

Petitioner recalled that her shoulder "was in so much pain (8/10)" the evening of her vaccination that she "had a very difficult time sleeping." Ex. 11 at ¶10; Ex. 16 at ¶3. She went on vacation the week after her vaccination, but it was "not enjoyable" due to pain that she rated 7-8/10. Ex. 21 at ¶4. When she returned and "struggled to perform [her] normal [work] duties due to the pain," she sought treatment. *Id.* at ¶5.

Twenty-one days after her vaccination, Petitioner visited her primary care provider ("PCP") with complaints of left arm pain that began "two weeks ago when she received her flu shot." Ex. 2 at 3. She also reported left elbow pain that had been present for four months triggered by exercises. *Id.* On exam, there was tenderness over the anterior left

2

shoulder and left elbow, normal elbow range of motion, and normal left shoulder range of motion with pain. *Id*. at 4. Petitioner was diagnosed with shoulder tendonitis, lateral epicondylitis, and cervicalgia. *Id*. at 4. She was prescribed a course of prednisone and advised to use heat and ice. *Id.*

On November 14, 2017, Petitioner had an appointment with a nurse practitioner at her employee health office in connection with a worker's compensation claim. Ex. 12 at 129. She reported that she had received a flu shot on October 12, 2017 and "ha[d] been having pain in her left arm ever since then." *Id*. Petitioner reported difficulties with dressing and lifting her arm over her head. *Id*. She was referred to physical therapy. *Id*.

The following day (November 15, 2017), Petitioner had an initial physical therapy evaluation. Ex. 4 at 1. She rated her pain as 8/10. *Id*. at 3. The next day at her second physical therapy treatment, she reported no pain at rest but 8/10 with movement. *Id*. at 4. She completed seven sessions before her discharge on November 30, 2017. *Id*. at 11. Upon discharge, Petitioner reported increasing pain and difficulty with ADLs and sleep over the previous week. *Id*.

Petitioner returned to occupational health on December 5, 2017. Ex. 12 at 126. She reported pain levels between 0/10 and 8/10, depending on movement. *Id*. An MRI that evening revealed mild supraspinatus tendinopathy with a partial-thickness tear, a sprain of the infraspinatus muscle, and a small amount of bursal fluid. *Id*. at 123-24. Petitioner returned to occupational health on December 13, 2017. *Id*. at 118. She reported pain up to 10/10 when she "reaches or goes overhead." *Id*. She was referred to an orthopedic surgeon. *Id*.

On December 19, 2017, Petitioner had her first appointment with orthopedist, Dr. Craig Roodbeen. Ex. 5 at 10. She now reported left shoulder pain that had improved with oral steroids, but had returned and caused difficulty sleeping. *Id.* She was diagnosed with an incomplete left rotator cuff tear and was given a cortisone injection. *Id*. Petitioner also visited occupational health that day. Ex. 12 at 116. She reported her visit with the orthopedist and noted that "she [was] feeling better after the injection." *Id*. Approximately two weeks later, on January 3, 2018, she noted that she felt that the relief from the injection was starting to wear off. *Id*. at 111.

On January 17, 2018, Petitioner underwent an independent medical examination with an orthopedist in connection with her workers compensation claim. Ex. 12 at 99-103. The evaluator concluded that Petitioner had impingement of her left shoulder. *Id*. at 101. He noted that her range of motion was "substantially improved," although she still had night pain. *Id*. He recommended a second cortisone injection and predicted that Petitioner

3

would reach maximum medical improvement within one month following said injection. *Id*. at 102.

Petitioner returned to Dr. Roodbeen on February 13, 2018. Ex. 5 at 9. She reported feeling 75-80% improved with "continued pain with certain motions and difficulty sleeping at night." *Id*. She was referred to physical therapy, which she began on February 23, 2018. *Id.*; Ex. 6 at 4-7. At her initial evaluation, Petitioner rated her pain as 4/10 and intermittent. *Id*. at 7. Beginning with her second session, Petitioner reported no pain at rest. *Id*. at 8. After twelve physical therapy sessions, Petitioner had met all her therapy goals and was discharged to a home exercise program on March 27, 2018. *Id*. at 21-22. She reported that by the end of her second course of physical therapy she was "feeling stronger and pretty healthy again." Ex. 11 at ¶22; *See also* Ex. 21 at ¶10.

Petitioner followed up with Dr. Roodbeen on April 9, 2018. Ex. 5 at 8. She reported improved strength and range of motion, but still had pain. *Id*. She returned on May 22, 2018 reporting "some increased pain and stiffness . . . after performing a lot of yard work." *Id*. at 7. A second cortisone injection was administered, which Petitioner stated she chose "because [she] really wanted to enjoy [her] summer pain free. Ex. 11 at ¶23; Ex. 11 at ¶11. She was instructed to follow-up as needed. Ex. 5 at 7. Petitioner reported "on and off again pain" at this time. Ex. 11 at ¶25; Ex. 21 at ¶12.

On July 2 or 3, 2018, Petitioner fell onto her back while on her boat. *See* Ex. 5 at 5; Ex. 6 at 23-24. She sought treatment from an orthopedist (at the same practice as Dr. Roodbeen) on August 9, 2018, complaining of pain in her lower back that "radiates to the left and right shoulders and cervical region." Ex. 5 at 5. The doctor noted that Petitioner was a "perfectly fine woman before this accident," and considered her to have "discogenic disease of the cervical spine which is giving her problems with pain into her arms and back." *Id.* at 6. He referred Petitioner to physical therapy and ordered a lumbar MRI. *Id.*

Petitioner returned to physical therapy the following day. Ex. 6 at 23. She reported "neck, back, bilateral UE pain at 3-7/10 following a fall." *Id*. at 24. She completed 17 sessions of physical therapy through her discharge on October 5, 2018, having met all but one of her goals. *Id*. at 44.

On September 14, 2018, Petitioner consulted with a physical medication and rehabilitation specialist about the "diffuse pain in [her] neck, shoulders, upper back, lower back, and proximal thighs." Ex. 7 at 4. She deemed her July fall as the start of her pain. *Id*. The doctor suspected "a possible diagnosis of polymyalgia rheumatica," prescribed prednisone, and referred Petitioner to a rheumatologist for further evaluation. *Id*. at 6. She returned on September 27, 2018, reporting "feeling 90% better" with no pain while taking the medication. *Id*. at 7.

On October 23, 2018, Petitioner was diagnosed with rheumatoid arthritis. Ex. 17 at 11-13. Her primary symptoms were stiffness in her neck, shoulders, and hips. *Id*. at 12. On December 7, 2018, she reported "deep, achy pain" in both shoulders, difficulty raising her arms, and pain in her neck, shoulders and upper back, although oral steroids almost completely resolved her symptoms. *Id*. at 16. On exam, she had tenderness and synovitis in both shoulders. *Id*. at 17. The rheumatologist opined that her pain was "most likely multifactorial," and consistent with neuropathic pain. *Id*. at 19. He prescribed sulfasalazine and Neurontin. *Id*. By February 8, 2019, Petitioner's joint pain was "doing well." *Id*. at 23.

On April 22, 2019, Petitioner returned to her orthopedist with complaints of pain in her right shoulder for the past 4-6 months. Ex. 5 at 22. She was assessed with bursitis and an MRI was ordered. *Id*. at 24. A May 1, 2019 MRI of the right shoulder revealed degenerative changes in the superior labrum and AC joint, a small to moderate amount of fluid in the bursa, mild tendinopathy in the distal subscapularis tendon, suspected tenosynovitis of the biceps tendon, and a large full-thickness tear of the rotator cuff. *Id*. at 30-31. On July 15, 2019, Petitioner had arthroscopic surgery on her right shoulder, including arthroscopic repair of a "significant partial-thickness rotator cuff tear," arthroscopic acromioplasty, and manipulation under anesthesia. Ex. 13 at 15-16.

Two months later, on July 25, 2019, Petitioner retuned to Dr. Roodbeen for a post-operative follow-up appointment. Ex. 13 at 52. She reported an "increased amount of left shoulder pain the past couple of months." *Id*. at 53. Dr. Roodbeen suspected "mild adhesive capsulitis in addition to her previous rotator cuff tear." *Id*. at 55. He administered a cortisone injection to her left shoulder. *Id*. She returned on August 26, 2019, with continued discomfort in her left shoulder, for which she was given a home exercise plan. *Id*. at 46-47.

On October 7, 2019, Petitioner returned to Dr. Roodbeen with bilateral shoulder pain. Ex 13 at 38-41. She reported relief in her left shoulder pain for two months after the previous cortisone injection. *Id*. at 39. Dr. Roodbeen assessed Petitioner's symptoms as "consistent with a possible rotator cuff tear and adhesive capsulitis." *Id*. at 40. He referred her to physical therapy and ordered an MRI, which was done on October 16, 2019. *Id*. at 40, 65. The MRI revealed moderate distal supraspinatus tendinosis with a deep partial-thickness tear, mild to moderate distal infraspinatus tendinosis, and a small to moderate amount of fluid in the bursa and glenohumeral joint with diffuse synovitis. *Id*. at 65.

Between October 23, 2019 and November 5, 2019, Petitioner attended three physical therapy sessions for her left shoulder. Ex. 13 at 5. Although Petitioner was progressing toward her goals, she was discharged in anticipation of surgery. *Id*. at 7.

5

On November 5, 2019, Petitioner returned to Dr. Roodbeen to discuss her MRI results. Ex. 16 at 50. He assessed a partial rotator cuff tear and adhesive capsulitis. *Id*. at 52. Petitioner received a cortisone injection, but elected to postpone surgery until January 2020 due to a new job. *Id.* Petitioner had an arthroscopic rotator cuff repair and acromioplasty with bursectomy on her left shoulder on January 24, 2020. *Id*. at 12-13.

Petitioner had a post-operative follow up on February 3, 2020, at which time she was referred to physical therapy. Ex. 16 at 42-45. She returned on March 2, 2020, with continued improvement. *Id*. at 32-34. She was advised to continue with physical therapy and home exercises. *Id*. at 34. At her final telehealth follow up on April 21, 2020, Petitioner reported continued improvement with her home exercises. *Id*. at 32-34.

Petitioner had eleven post-operative physical therapy treatments between February 18 - March 13, 2020. Ex. 23 at 10-107. At her initial evaluation she rated her pain at 3/10. *Id*. at 107. At her final visit, her pain was 1/10 and intermittent. *Id*. at 10. Petitioner reported that her physical therapy closed on March 17, 2020 due to the Covid-19 pandemic and that she continued to do exercises at home. Ex. 21 at ¶16. She has "regained full use of her shoulder/arm (with continued muscle weakness and lessened flexibility" after her surgery. *Id*. at ¶20.

B. *Expert Testimony and Doctor Letters*

Dr. Jeffrey R. Gagliano

On June 26, 2022, Dr. Jeffrey R. Gagliano provided an expert report on behalf of Respondent. Ex. A. Dr. Gagliano obtained his Bachelor of Science degree in Biology/Microbiology from Cornell University in 1993, his Master of Arts degree in Applied Physiology from Columbia University in 1998, and his M.D. from the University of Colorado School of Medicine in 2002. *See* CV, filed as Ex. B (ECF 51-2) at 1. He thereafter completed a residency in orthopedic surgery at the University of California, San Francisco, and a fellowship in sports medicine at the Steadman Hawkins Clinic in Denver, Colorado. *Id.* Since his residency, Dr. Gagliano has focused on shoulder and knee problems. Ex. A at 1. He is a Fellow of the American Academy of Orthopedic Surgeons, a Diplomate of the American Board of Orthopedic Surgeons, a Member of the American Shoulder and Elbow Surgeons, and a Reviewer for the Journal of Shoulder and Elbow Surgery. Ex. B at 1. He currently has a clinical practice that "includes regular evaluation and management of patients with a myriad of shoulder conditions, ranging from sports injuries to degenerative conditions to infection processes. Ex. A at 1.

In his report, Dr. Gagliano notes that he reviewed Petitioner's Exhibits 1-18 in reaching his opinions. Ex. A at 1-2. In his opinion, Petitioner's left rotator cuff tear was not caused by her vaccination, but was more likely pre-existing. *Id*. at 3. He noted that

6

Petitioner has been diagnosed with polymyalgia rheumatica, rheumatoid arthritis, and Raynaud's syndrome, all of which "are associated with chronic, systemic inflammation" and therefore constituted "a significant risk for shoulder disease." *Id*. at 2. He further notes that Petitioner had a fall in the summer of 2018,[3] which caused injuries. *Id*. Dr. Gagliano's opinion is that Petitioner's "left shoulder tear progressed to an eventual full thickness tear, which is consistent with well-known and documented natural history of rotator cuff disease and . . . especially in the setting of rheumatoid arthritis and chronic inflammatory conditions. *Id*. at 3. He does not believe that Petitioner's "left shoulder disease and need for surgery are related to her flu vaccine." *Id*. He notes that she "had recovered from whatever temporary symptoms and pain her vaccine may have caused by March 2018," then "fell in a boat three months later . . . which is a common mechanism causing rotator cuff tears and/or the progression of an existing tear." *Id.* In his opinion, the trauma from Petitioner's fall and her chronic inflammatory conditions, and not her October 2017 flu vaccine, led to the gradual progression of her rotator cuff tear and the need for left shoulder surgery. *Id*.

In response to Petitioner's Exhibit 18 (a letter from Petitioner's treating orthopedist), Dr. Gagliano notes that Dr. Roodbeen did not state that Petitioner's rotator cuff tear was caused by her vaccination. Ex. A at 3. In his opinion, "it would be so incredibly difficult, if not impossible, to cause a rotator cuff tear with a small, flexible syringe needle used to provide a vaccination in the deltoid." *Id*.

Letter from Dr. Roodbeen

On November 4, 2021, Petitioner's treating orthopedist, Dr. Craig W. Roodbeen, provided a letter in support of Petitioner's claim. Ex. 18 at 1. Dr. Roodbeen opined that "the flu vaccination was the cause of her left shoulder pain that developed in October 2017 and that ultimately led to the repair of the rotator cuff tear in January 2020*."* According to Dr. Roodbeen, the progression from a partial-thickness tear in 2017 to a full-thickness tear in 2020 was a "natural progression." *Id*.

### III.    Legal Standard

#### A.  *Law Governing Analysis of Fact Evidence*

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined

---

[3] Dr. Gagliano's report states that Petitioner fell in June, however, the medical records suggest the fall occurred on July 2 or 3, 2018. *See* Ex. 5 at 5; Ex. 6 at 23-24.

to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The *Graves* court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595. Under this alternative approach, the statutory cap merely

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

### B. Analysis of Expert Testimony

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)). "The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

The *Daubert* factors play a slightly different role in Vaccine Program cases than they do when applied in other federal judicial fora (such as the district courts). *Daubert* factors are usually employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable and/or could confuse a jury. In Vaccine Program cases, by contrast, these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs.*, 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

A special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an

9

analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08-601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. Appx. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

Expert opinions based on unsupported facts may be given relatively little weight. *See Dobrydnev v. Sec'y of Health & Hum. Servs.*, 556 F. Appx. 976, 992–93 (Fed. Cir. 2014) ("[a] doctor's conclusion is only as good as the facts upon which it is based") (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("[w]hen an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion")). Expert opinions that fail to address or are at odds with contemporaneous medical records may therefore be less persuasive than those which correspond to such records. *See Gerami v. Sec'y of Health & Hum. Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *aff'd*, 127 Fed. Cl. 299 (2014).

### IV.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all relevant times Ms. Williams was a competent adult with no impairments that would impact her awareness of her injury. Therefore, my analysis focuses primarily on the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole, including all medical records, affidavits, and other material filed, as well as all assertions made by the parties in their filings. In this case, the parties materially disagree about both the severity and duration of Petitioner's SIRVA injury. Petitioner argues that she suffered a "moderately severe SIRVA," which required surgery to repair a full-thickness rotator cuff tear and lasted more than two years. Br. at 10-11. In contrast, Respondent argues that Petitioner suffered a fairly mild SIRVA over a period of eight months, with later complications caused by "intervening events and comorbidities." Resp. at 14. Respondent thus disputes that Petitioner's surgery was related to, or necessitated by, her SIRVA.

After reviewing the record in this case and considering the parties' written arguments, I find that the record best supports the conclusion that Petitioner suffered a mild to moderate SIRVA injury which was later substantially complicated by other serious medical conditions. There is no dispute that Petitioner sought treatment for her left shoulder pain within 21 days of her vaccination, reported high levels of pain (8/10) initially, was treated by an orthopedist, had x-rays and an MRI of her shoulder, received a prescription for prednisone, had two cortisone injections, and attended 19 sessions of physical therapy between October 2017 and May 22, 2018 (approximately 7.5 months after her vaccination). However, the extent to which Petitioner's subsequent and/or concurrent medical conditions may have impacted her left shoulder is a relevant consideration with respect to her pain and suffering award.

First, Petitioner's medical records reflect that, although she did have a partial-thickness rotator cuff tear, her left shoulder symptoms had largely resolved by the end of her second course of physical therapy on March 27, 2018. Ex. 6 at 21-22. At that time, Petitioner had met all her therapy goals and was discharged to a home exercise program. Her pain had reduced to 1-2/10 with activity, and 0/10 at rest. *Id.* Further, she stated in her affidavit, and again in her supplemental affidavit, that by the end of her second course of physical therapy she was "feeling stronger and pretty healthy again." Ex. 11 at ¶22; *See also* Ex. 21 at ¶10. At follow-up appointments with her orthopedist on April 9, 2018 and May 22, 2018, Petitioner reported similar improvements in her symptoms, with some lingering pain. Ex. 5 at 7-8. She opted for a second cortisone injection at that time "because [she] really wanted to enjoy [her] summer pain free. Ex. 11 at ¶23; Ex. 11 at ¶11. She was released from care at that time with instructions to follow-up if needed. Ex. 5 at 7. Petitioner reported only "on and off again pain" at this time. Ex. 11 at ¶25; Ex. 21 at ¶12. Therefore, by late-May 2018, Petitioner had largely recovered from the symptoms that began after her vaccination, albeit with some of the lingering symptoms that are that are typically seen in these cases.

The next time Petitioner sought treatment was three months later, on August 9, 2018, when she returned to her orthopedist. Ex. 5 at 5. At that time, she reported a fall on her boat on July 3, 2018, after which she developed low back pain that she described as "radiat[ing] to the left and right shoulders and cervical region." *Id*. She described the onset of her symptoms that day as "sudden," occurring at the time of her fall. *Id*. Neither Petitioner nor the doctor related her symptoms to her previous left shoulder problem or to her flu vaccination. The next day Petitioner began physical therapy for her new symptoms, reporting "neck, back, bilateral UE pain at 3-7/10 following a fall." Ex. 6 at 24. The record records "onset of the current problem" as "07/02/18." *Id*. Again, Petitioner did not relate her symptoms to her flu vaccination or her prior left shoulder injury.

11

When Petitioner continued to experience diffuse pain in [her] neck, shoulders, upper back, lower back, and proximal thighs" in the fall of 2018, she sought care from a physical medicine and rehabilitation specialist, who, based on her symptoms, referred her to a rheumatologist for further evaluation. Ex. 7 at 4. Again, Petitioner did not relate her pain to her flu vaccination or prior left shoulder injury. Instead, she reported her fall as the cause of her pain. *Id*. On October 23, 2018, she was diagnosed with rheumatoid arthritis. Ex. 17 at 11-13. Her primary symptoms were stiffness in her neck, shoulders, and hips. *Id*. at 12. At a December 7, 2018 follow-up, she reported "deep, achy pain" in both shoulders, difficulty raising her arms, and pain in her neck, shoulders and upper back. *Id*. at 16. *Id*. On exam, she had tenderness and synovitis in both shoulders. *Id*. at 17. By February 8, 2019, Petitioner's joint pain was "doing well" with treatment. *Id*. at 23. There is no indication in the records that Petitioner or her doctors attributed these symptoms to her flu vaccination nor to her previous left shoulder problems, including her known partial-thickness rotator cuff tear.

Petitioner did not seek treatment again for left shoulder pain until July 25, 2019, almost 21 months after her vaccination and approximately 14 months after her last left shoulder treatment. Ex. 13 at 52. At that time, she reported an "increased amount of left shoulder pain the past couple of months," a period in which she had received treatment, including surgery, for her right rotator cuff tear. *Id*. at 13-16; Ex. 5 at 22-24. Thereafter, Petitioner continued to treat her left shoulder pain both conservatively and surgically. *See* Ex. 13, 16.

Thus, the records indicate that Petitioner's SIRVA injury had stabilized by around May 22, 2018, at her orthopedist visit. It was not until approximately 14 months later - and after a significant fall not itself attributable to that prior SIRVA, a rheumatoid arthritis diagnosis, and a rotator cuff surgery on her right shoulder - that Petitioner sought additional treatment for left SIRVA symptoms. Although Petitioner argues that her left shoulder treatment from July 2019 through March 2020 was associated with the SIRVA, there simply is not preponderant evidence in the record to support that conclusion.

First, Petitioner described the nature of her left shoulder pain differently during her initial treatment in comparison to the period after her fall. Petitioner initially described primarily intense pain with range of motion and night pain that disrupted sleep. *See e.g.*, Ex. 2 at 4; Ex. 4 at 4; Ex. 12 at 118, 126. After her fall, Petitioner described first pain radiating from her lower back and then a constant deep achy pain. *See e.g.* Ex. 5 at 5; Ex. 7 at 4; Ex. 17 at 16. Petitioner made no mention of her vaccination or her prior left shoulder problems during this time. In fact, the orthopedist that treated Petitioner after her fall noted that prior to the fall she was "perfectly fine," corroborating Petitioner's prior recovery from her SIRVA injury. Ex. 5 at 5. Thus, these records suggest that Petitioner was no longer suffering from her previous rotator cuff symptoms at the time of her fall.

12

Second, Respondent has provided a persuasive expert opinion on the question of the impact of Petitioner's fall in July 2018 as well as her rheumatoid arthritis diagnosis in October 2018. *See* Ex. A. The dispute between the parties is not whether Petitioner had a SIRVA injury (a fact that Respondent has conceded), but whether her flu vaccination was the cause of her treatment and surgery in 2019 and 2020 (after a gap of more than a year). Dr. Gagliano opined that it would be "incredibly difficulty, if not impossible" for a flu shot to cause a rotator cuff tear. Ex. A at 3. Rather, he considered it more likely than not that Petitioner had a pre-existing tear that worsened over time, and with contribution from her fall in July 2018 and from her chronic inflammatory conditions, to necessitate a surgical repair in January 2020. *Id*. According to Dr. Gagliano, such a mechanism "is consistent with well-known and documented natural history of rotator cuff disease," "especially in the setting of rheumatoid arthritis and chronic inflammatory conditions." *Id*.

In contrast, Petitioner almost entirely ignores both the fall and rheumatoid arthritis diagnoses in her filings. Although her first affidavit was signed on September 13, 2019, Petitioner does not mention her fall in July 2018. *See* Ex. 11. She also failed to mention it in her supplemental affidavit which she signed on August 25, 2022. *See* Ex. 21. Further, in her brief, Petitioner omits all treatment between May 22, 2018 and July 25, 2019 in her statement of the facts (seemingly suggesting that those are irrelevant to her SIRVA injury). *See* Br. at 4-5. Finally (and perhaps most significantly), Dr. Roodbeen, Petitioner's treating orthopedist, does not address Petitioner's fall or her rheumatoid arthritis diagnosis in his letter. *See* Ex. 18. He provides no reasoning for his conclusion that Petitioner's "flu vaccination was the cause of her left shoulder pain that developed in October 2017 and that ultimately led to the repair of the rotator cuff in January 2020." *Id*. As such, his letter does not effectively counter the points made by Dr. Gagliano, nor provides persuasive evidence linking Petitioner's initial left shoulder symptoms with the symptoms that emerged 14 months later and required surgery. Therefore, Petitioner has not provided preponderant evidence that her left shoulder pain (and the full-thickness tear that required surgical repair) after late-May 2018 was attributable to the flu vaccination she received on October 12, 2017.

The comparable SIRVA cases cited by Petitioner involve petitioners who were awarded between $135,000 and $160,000 for past pain and suffering. Br. at 8-9, 11-12. However, Petitioner's argument relies on the conclusion that her vaccine-related injury includes the full spectrum of her treatment, including surgery, over a period of approximately two-plus years. But because Petitioner's treatment after May 2018 has not been proven to be linked to her vaccination, Petitioner's requested award for pain and suffering is too high.

At the same time, although the cases cited by Respondent are more appropriate given my findings, they are also distinguishable. Two of Respondent's cited cases involve

petitioners who initially did not seek treatment for their SIRVA injuries for approximately four months, a period far longer than for Ms. Williams. *See Ramos v. Sec'y of Health & Human Servs.*, No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021); *Rayborn v. Sec'y of Health & Human Servs.*, No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020). Further, the petitioner in *Clendaniel* did not have any physical therapy treatment, whereas Ms. Williams participated in 19 sessions, in two separate courses. *Clendaniel v. Sec'y of Health & Human Servs.*, No. 20-213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021). Finally, the petitioner in *Norton* never reported severe pain and recovered from her SIRVA injury in less time than did Ms. Williams. *Norton v. Sec'y of Health & Human Servs.,* No. 19-1432V, 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021).

I find Petitioner's situation to be most similar to the Petitioner in *Coluccio v. Sec'y of Health & Human Servs.*, No. 19-1684V, 2022 WL 17849579 (Fed. Cl. Spec. Mstr. Dec. 15, 2022). That individual sought treatment 27 days after his vaccination, and then actively treated his SIRVA injury for approximately seven to eight months. *Id*. at *4. He reported high levels of pain initially ("7-10 out of 10 with certain motions"), had x-rays and an MRI, was prescribed medications, received one cortisone injection (with minimal relief), and had 19 physical therapy treatments. *Id.* By six months after his vaccination, Mr. Coluccio reported 60% improvement. Id. He was awarded $80,000.00. *Id*. at *5. Similarly, Ms. Williams, sought treatment in 21 days and actively treated her SIRVA for seven and a half months with prescription medication, treatment by an orthopedist, x-rays and an MRI, two cortisone injections, and 19 physical therapy sessions. Both reported high levels of pain in the first few months of treatment. Although Ms. Williams' symptoms improved faster than did Mr. Coluccio's (75-80% improvement within 4 months versus 60% at the end of five months of treatment), she required a second cortisone injection, justifying a similar award.

For these reasons, I find that **$80,000.00** in total compensation for actual pain and suffering is reasonable and appropriate in this case.

V.     **Appropriate Compensation for Petitioner's Past Medical Expenses**

Petitioners may be awarded reasonably necessary actual unreimbursable expenses that were incurred by or on behalf of the person who suffered a vaccine injury. Section 15(a)(1)(B). Petitioner seeks reimbursement for certain expenses incurred between October 16, 2019 and March, 2020. *See* Ex. 19. As all of those expenses were incurred after May, 2018, I find that Petitioner has not provided preponderant evidence that said expenses were due to her SIRVA injury. Therefore, Petitioner's request is denied.

### VI.     Appropriate Compensation for Petitioner's Past Lost Wages

The Vaccine Act provides for an award of a petitioner's "actual and anticipated loss of earnings," where "earning capacity is or has been impaired by reason of such person's vaccine-related injury." Section 15(a)(3)(A). Compensation for lost wages "may not be based on speculation." *Moreland v. Sec'y of Health & Human Servs.*, No. 18-1319V, 2022 WL 10469047, at *3 (Fed. Cl. Spec. Mstr. Sept. 2, 2022).

Petitioner seeks reimbursement for lost wages for 36 weeks of work between November 4, 2019 and March 19, 2020, after she changed jobs. *See* Ex. 20. Petitioner stated that she "decided to leave her full-time job in the hospital setting and take on a contingent position in Pulmonary Rehab, a job that had a less physical requirements [sic]. This job began on November 4, 2019." Ex. 21 at ¶14. She noted that her decision was based on the fact that "due to [her] job responsibilities in caring for and treating critically ill patients over the course of the past two years, it was getting more and more difficult for [her] to fulfill [her] job related duties." *Id*. As all of the lost wages claimed were incurred after November 4, 2019, based on my findings herein, I find that Petitioner has not provided preponderant evidence that her claimed lost wages were caused by her SIRVA injury. Therefore, Petitioner's request is denied.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I award Petitioner a lump sum payment of $80,000.00, representing her actual pain and suffering.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act.

The Clerk of Court is directed to enter judgment in accordance with this Decision.[5]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u><br>
Brian H. Corcoran<br>
Chief Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.